UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

ARTHEA KILCREASE,            )
on behalf of M.L.D.B.,       )
                             )
        *Plaintiff*,         )
                             )
v.                           )            No. 4:16-cv-85-SKL
                             )
COMMISSIONER OF SOCIAL SECURITY,  )
                             )
        *Defendant*.         )

## MEMORANDUM AND ORDER

Plaintiff Arthea Kilcrease ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her minor son supplemental security income ("SSI"). Each party has moved for judgment [Docs. 22 & 24] and filed supporting briefs [Docs. 23 & 25]. This matter is now ripe. For the reasons stated below, (1) Plaintiff's motion for summary judgment [Doc. 22] will be **DENIED**; (2) the Commissioner's motion for summary judgment [Doc. 24] will be **GRANTED**; and the decision of the Commissioner will be **AFFIRMED**.

## I.    ADMINISTRATIVE PROCEEDINGS

Plaintiff, acting on behalf of her minor son ("Claimant"), filed an application for SSI on December 6, 2012 [Doc. 14 ("Tr.") at Page ID # 184-200], alleging Claimant's disability began March 22, 2012 (Tr. 12, 126). Plaintiff's claim was denied initially and upon reconsideration at the agency level. After a hearing was held August 3, 2015, the administrative law judge ("ALJ") found on December 18, 2015, that Claimant was not under a disability as defined in the Social Security Act (Tr. 12-26). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (Tr. 1-5). Plaintiff timely filed the instant

action [Doc. 1].

## II.  FACTUAL BACKGROUND

### A.  Medical Records

Claimant was born in 2006, making him a child under age 18 (Tr. 126).  In a Child Disability Report, Plaintiff alleged Claimant was disabled due to a developmental disorder, possibly autism (Tr. 149).  Plaintiff [Doc. 23 at Page ID # 477-86] and the ALJ (Tr. 15-19) set forth a detailed, factual summary of Claimant's medical record, school record, and the hearing testimony.  Defendant generally adopts the facts as set forth by the ALJ [Doc. 25 at Page ID # 503], but includes extensive citation to the record throughout her argument [*id.* at Page ID # 505-15].

### B.  Hearing Testimony

A video teleconference hearing occurred on August 3, 2015, at which Claimant and Plaintiff testified (Tr. 30-64).  The Court has carefully reviewed the transcript of the testimony.

## III.  ELIGIBILITY AND THE ALJ'S FINDINGS

### A.  Eligibility

A child will be considered disabled if he has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations."  42 U.S.C. § 1382c(a)(3)(C).  To determine whether a child's impairments result in marked and severe limitations, Social Security Administration ("SSA") regulations prescribe a three-part evaluation:

(1)    A child will be found "not disabled" if he engages in substantial gainful activity.

(2)    A child will be found "not disabled" if she does not have a severe impairment or combination of impairments.

(3)    A child will be found "disabled" if she has an impairment or combination of

impairments that meets, medically equals, or functionally equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

20 C.F.R. § 416.924(a)-(d).

To determine whether a child's impairments functionally equal a listing, the SSA assesses the functional limitations caused by the child's impairments. 20 C.F.R. § 416.926a(a). To do so, the SSA considers how a child functions in six domains:

(1)     Acquiring and using information;

(2)     Attending and completing tasks;

(3)     Interacting and relating with others;

(4)     Moving about and manipulating objects;

(5)     Caring for yourself; and,

(6)     Health and physical well-being.

20 C.F.R. § 416.926a(b)(1). If a child's impairments result in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairment functionally equals the listings, and the child is considered disabled. 20 C.F.R. § 416.926a(d). The SSA will find a "marked" limitation in a domain when a child's impairments "interferes seriously" with the child's ability to "independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2). It is the equivalent of the functioning the SSA expects "to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id.* Extreme limitations interfere "very seriously" with the child's ability to "independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3). It is the equivalent of the functioning the SSA expects "to find on standardized testing with scores that are at least three standard deviations below the mean." *Id.*

**B.     The ALJ's Findings**

The ALJ found Claimant was a preschooler on the date his application was filed and was a school-age child at the time the ALJ issued his decision; that Claimant had not engaged in substantial gainful activity since December 6, 2012, the date the application was filed[1]; and that Claimant suffered from the following severe impairments: borderline intellectual functioning/developmental delay ("BIF"), and an anxiety-related disorder/post-traumatic stress disorder ("PTSD") (Tr. 15).   Next, the ALJ found that Claimant's impairments did not meet or medically equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 15).  The ALJ further found that Claimant's impairments did not functionally equal the listings because Claimant did not have an impairment or combination of impairments that resulted in two marked limitations or one extreme limitation in the applicable domains of functioning (Tr. 16-26). More specifically, the ALJ found that Claimant has marked limitation in the domain of interacting and relating with others, but "less than marked" limitation in the remaining five domains. Therefore, the ALJ found Claimant was not disabled under section 1614(a)(3)(C) of the Social Security Act (Tr. 26).

**IV.     ANALYSIS**

Plaintiff asserts this matter should be remanded under sentence four for further administrative proceedings, including a *de novo* hearing and decision, for several reasons: (1) "The ALJ's functional equivalence finding was the product of legal error and was not supported by substantial evidence," (2) "The ALJ's listing analysis was not supported by substantial evidence

---

[1] SSI applicants are not entitled to benefits until "the month following the month" that the application is filed, regardless of the date of alleged disability onset.  20 C.F.R. § 416.335.

and was the product of legal error in that it fails to consider whether Claimant met or equaled Listing 112.05," and (3) "The ALJ's adverse credibility determination was not supported by substantial evidence." [Doc. 23 at Page ID # 474].

## A.    Standard of Review

The Social Security Act authorizes "two types of remand: (1) a post judgment remand in conjunction with a decision affirming, modifying, or reversing a decision of the [Commissioner] (a sentence-four remand); and (2) a pre-judgment remand for consideration of new and material evidence that for good cause was not previously presented to the [Commissioner] (a sentence-six remand)." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (Citing 42 U.S.C. § 405(g)).  Under a sentence-four remand, the Court has the authority to "enter, upon the pleadings and transcript of the record, a judgment affirming, denying, or reversing the decision of the [Commissioner], with or without remanding the cause for a hearing."  42 U.S.C. § 405(g). Where there is insufficient support for the ALJ's findings, "the appropriate remedy is reversal and a sentence-four remand for further consideration."  *Morgan v. Astrue*, No. 10-207, 2011 WL 2292305, at *8 (E.D. Ky. June 8, 2011) (citing *Faucher*, 17 F.3d at 174).

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence.  42 U.S.C. § 405(g); *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (internal citations omitted).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (internal citations omitted).  Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight."  *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (internal citations

omitted).  If there is substantial evidence to support the Commissioner's findings, they should be

affirmed, even if the court might have decided facts differently, or if substantial evidence would

also have supported other findings.  *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v.*

*Richardson*, 440 F.2d 690, 691 (6th Cir. 1971).  The court may not re-weigh evidence, resolve

conflicts in evidence, or decide questions of credibility.  *Garner*, 745 F.2d at 387.  The substantial

evidence standard allows considerable latitude to administrative decision makers because it

presupposes "there is a 'zone of choice' within which the Commissioner can act, without the fear

of court interference." *McClanahan*, 474 F.3d at 833 (quoting *Buxton v. Halter*, 246 F.3d 762, 772

(6th Cir. 2001)).

The court may consider any evidence in the record, regardless of whether it has been cited

by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may

not, however, consider any evidence that was not before the ALJ for purposes of substantial

evidence review.  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  Furthermore, the court is

under no obligation to scour the record for errors not identified by the claimant, *Howington v.*

*Astrue*, No. 2:08-CV-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that

assignments of error not made by claimant were waived), and arguments not raised and supported

in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, No.

1:08-CV-651, 2009 WL 3153153, at *7 (W.D. Mich. Sept. 29, 2009) (citing *McPherson v. Kelsey*,

125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claims of error without further

argument or authority may be considered waived).

B.      **The ALJ's Listing Analysis**

Plaintiff argues the ALJ erred in failing to specifically explain why Claimant did not meet

the requirements for Listing 112.05, intellectual disability, particularly sections (D) and (E).  True, the ALJ did not provide any specific analysis at Step Three concerning whether Claimant's conditions met or medically equaled a Listing; instead, he wrote that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926)," and then provided an in-depth explanation of why Claimant's impairments did not *functionally equal* a listing (Tr. 15).  Plaintiff is also correct that the Sixth Circuit has held that such a limited step three analysis can be insufficient and require remand.  *See Reynolds v. Comm'r*, 424 F. App'x 411, 416 (6th Cir. 2011) (citations omitted) ("In short, the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review.  Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.")  And, had the ALJ's decision not contained any further analysis elucidating the reasons why he found Claimant did not meet the requirements of Listing 112.05, remand would likely be appropriate.  However, as explained below, that is simply not the case here.

At the time of the ALJ's decision, Listing 112.05(D) and (E) both required "significantly subaverage general intellectual functioning" with "deficits in adaptive functioning," and a "valid verbal, performance or full scale IQ of 60 through 70."[2]  Section D also required a "physical or

---

[2] The regulation has been updated since this case began.  *See* 81 Fed. Reg. 66,138-01, 2016 WL 5341732, at *66149-50 (Sept. 26, 2016).  Intellectual disability is now referred to as "intellectual disorder."  The revisions were not in effect at the time Plaintiff applied for DIB or when the ALJ rendered his decision.  Regardless, the new regulations still require that a claimant have significantly subaverage intellectual functioning and significant deficits in current adaptive functioning.  *Id.* at *66169.

other mental impairment imposing an additional and significant limitation of function," and section E also required a marked impairment in age-appropriate social functioning, a marked impairment in age-appropriate personal functioning, or marked difficulties in maintaining concentration, persistence or pace.

Claimant has a full scale IQ of 70, as found by the consultative examiner (Tr. 184). Further, the ALJ found that Claimant had a marked limitation in interacting and relating with others, which tends to support a finding of disability under Listing 112.05(D) or (E). However, as stated, under either (D) or (E), Claimant must also have "significantly subaverage general intellectual functioning." Here, rather than "significantly subaverage," the ALJ found that Claimant functioned in the borderline range (Tr. 15). Plaintiff argues that Claimant's full-scale IQ score of 70, "combined with regularly approved IEP[3] and educational records codifying his special education and educational accommodations demonstrate Claimant's 'significantly subaverage general intellectual functioning' under Listing 112.05." [Doc. 23 at Page ID # 496 (citations omitted)].

The United States Court of Appeals for the Sixth Circuit has specifically found that functioning in the borderline range is not sufficient to meet the requirement of significantly subaverage general intellectual functioning found in Listing 112.05. *Barnett ex rel. D.B. v. Comm'r or Soc. Sec.*, 573 F. App'x 461, 463 (6th Cir. 2014). In that case, Barnett argued that D.B. met the requirements for Listing 112.05(D) primarily in reliance on D.B.'s diagnosis of BIF and D.B.'s IQ scores. The Sixth Circuit rejected the argument, reasoning:

> The key problem with Barnett's argument is that D.B.'s general intellectual functioning is not "significantly subaverage."

---

[3] An IEP is an Individual Education Program (Tr. 197).

No "evaluating mental health professional" or "school psychologist[]" has ever diagnosed D.B. with mental retardation. Every psychological expert, to the contrary, concluded that he fell within the "borderline" (and not "significantly subaverage") range. . . .

Barnett offers three rejoinders to this conclusion. *First*, she points out that D.B.'s verbal and perceptual IQ scores of 65 and 92, respectively, place him in the first and thirtieth percentiles of his peers. These low scores, she claims, satisfy 112.05(D)'s first requirement [of significant subaverage intellectual functioning] as a matter of law. But this interpretation collapses the Listing's first requirement (significantly subaverage general intellectual functioning) into its third (an IQ score between 60 and 70). It therefore runs afoul of the interpretive canon that requires us to try to give meaning to every word in a statute or regulation.

This argument also contradicts our precedents, published and unpublished alike. Consider *Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124 (6th Cir. 2003), a nearly identical case. The child's IQ scores in *Elam* were low enough to support a finding of mental retardation, but evaluating experts concluded that she demonstrated borderline intellectual functioning. *Id.* at 126-27. Highlighting the experts' opinions, we affirmed the denial of benefits because it was supported by substantial evidence. *Id.* at 127.

To be clear, an ALJ may consult IQ scores in evaluating intellectual functioning. But equating a low IQ score with "significantly subaverage" intellectual functioning overstates the relevance of the score. . . .

*Second*, Barnett makes the more modest point that D.B.'s IQ scores are low enough to justify a finding of "significantly subaverage generally intellectual functioning." But this argument enters the forbidden field of re-weighing the evidence. We must "accept the *agency's* factual finding[]" when it is supported by substantial evidence, even when substantial evidence could justify a different result. *Arkansas v. Oklahoma*, 503 U.S. 91, 113, 112 S.Ct. 1046, 117 L. Ed. 2d 239 (1992). The ALJ's decision fell within the zone of substantial evidence.

*Third*, Barnett faults the ALJ for thinking that a diagnosis of mental retardation is the only way to satisfy 112.05(D)'s first prong.

> Yet the ALJ did no such thing.  He surveyed the record and found
> that every expert had described D.B.'s intellectual functioning as
> "borderline," not "significantly subaverage."

*Id.* at 463-64 (emphasis and most alterations in original; some internal citations omitted).  Here, similarly, no medical professional has ever diagnosed Plaintiff with any more serious mental impairment than BIF.

Plaintiff correctly points out that the ALJ does not actually discuss or assign weight to the medical opinions of the consultative examiner and the State agency consultants in his decision.  The Court finds this is harmless error, however, because the medical opinions do not support a finding of disability, nor do they support a finding of any greater impairment than that found by the ALJ.  *See Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks and citation omitted)).  The State agency consultants found that Claimant had BIF, with less than marked limitations in all functional domains (Tr. 69-71, 81-83).  Plaintiff seems to argue both that these opinions should have been discussed by the ALJ and that the Court should not consider any post hoc rationalizations about the opinions because the state agency consultants did not have the benefit of the full medical records from Centerstone, a behavioral healthcare center where Claimant received a significant amount of his treatment [Doc. 23 at Page ID # 491-92 n.2].  Nevertheless, upon the ALJ's own review of Claimant's Centerstone record, the ALJ found Claimant was more limited than the State agency consultants, and even more limited than found by the one-time consultative examiner, E-Ling Cheah, Psy.D., H.S.P., as the ALJ found that Claimant was markedly impaired

10

in the domain of interacting and relating with others (Tr. 22-23).

Moreover, the ALJ did discuss the opinion of Dr. Cheah (Tr. 17, 19 & 23). Dr. Cheah specifically found that Claimant's "general cognitive ability is within the Borderline range of intellectual functioning," diagnosing him with an IQ of 70 (Tr. 184). Dr. Cheah further found that Claimant had no more than moderate impairments in his memory, his ability to sustain concentration, his ability to adapt to change, and in social relating (Tr. 187). The IQ score of 70 does not *per se* qualify Claimant for Listing 112.05(D) or (E), particularly considering Dr. Cheah specifically found that Claimant had only BIF (rather than a more serious impairment), with no more than moderate functional limitations. The ALJ discussed Dr. Cheah's findings and diagnoses in detail (Tr. 17, 19, 23), even if he did not explicitly assign them any particular weight. The ALJ's decision makes clear that he implicitly credited Dr. Cheah's opinion in part, by finding Claimant had BIF, and in finding that one of Claimant's most serious issues was his inability to socially relate to other people.[4] Significantly, no medical professional ever diagnosed Plaintiff with a more serious mental impairment than BIF, and Claimant's IQ score of 70 alone is insufficient to support a finding of significantly subaverage general intellectual functioning as required for Listing 112.05.

Plaintiff also argues that Claimant's "regularly approved IEP and educational records codifying his special education and educational accommodations demonstrate Claimant's 'significantly subaverage general intellectual functioning.'" [Doc. 23 at Page ID # 496]. However,

---

[4] The Court notes that the ALJ incorrectly stated that Dr. Cheah found Claimant's full scale IQ to be 58 (Tr. 17). The sum of Claimant's scaled scores was 58, and Dr. Cheah calculated Claimant's composite score to be 70. The Court finds no harmful error with this mistake by the ALJ, as the ALJ otherwise correctly detailed Dr. Cheah's diagnosis and findings.

the fact that Claimant was in special education does not equate with a finding that he has significantly subaverage general intellectual functioning. *See Barnett*, 573 F. App'x at 463 (claimant enrolled in special education but did not qualify for Listing 112.05). And, the content of the IEPs themselves show Claimant progressed in school, with his most recent IEP from September 2015 noting that his resource teacher shared that he had "grown and blossomed," his reading "has progressed greatly and he is much more motivated to work hard at school." (Tr. 369). His speech teacher recommended that he be dismissed from language services, noting that he "is able to express his wants and his communication needs can be met in the general education setting," and his occupational therapist also found that he no longer qualified for occupational therapy services because he had "progressed and met all goals." (Tr. 369). The ALJ discussed and clearly considered the September 2015 IEP in his decision (Tr. 19, 23). An earlier IEP from September 2013 noted improvement (Tr. 373), and even in 2011, his teachers found that his "overall cognitive ability fell within normal limits." (Tr. 374). The ALJ explicitly discussed the 2013 IEP, and the ALJ further found that "treating sources, teachers and the claimant's mother have all admitted the claimant's abilities improve when he is on prescribed medication." (Tr. 19).

The ALJ did not commit harmful error in failing to specifically explain why Claimant did not meet all the requirements of Listing 112.05. It is clear from the ALJ's decision that he found Claimant had BIF, not a more serious mental impairment that would support a finding of significantly subaverage general intellectual functioning, and that finding is supported by substantial evidence in the record. The fact that the ALJ included this analysis in his discussion of functional equivalence rather than earlier in the decision is also not harmful error. *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (citation omitted) (finding no error

where "the ALJ made sufficient factual findings elsewhere in his decision to support his conclusion at step three"); *see also Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (In affirming the ALJ's decision, the court noted that the ALJ "described evidence pertaining to all impairments, both severe and non-severe, for five pages earlier in his opinion and made factual findings," and affirmed "even though [the ALJ] did not spell out every fact a second time under the step three analysis."); *Kado v. Colvin*, No. 1:15-cv-02044-DAP, 2016 WL 6067779, at *8 (N.D. Ohio Oct. 17, 2016) (citing *Bledsoe*, 165 F. App'x at 411; other citations omitted) ("If at Step Three the ALJ does not provide meaningful analysis in concluding whether the claimant's impairment 'meets or equals' any of the listings in the Listing of Impairments, the Court may look at the ALJ's decision in its entirety to see if the ALJ made sufficient factual findings to support his conclusion.").

Accordingly, the Court finds Plaintiff's argument on this issue is without merit, and her motion will be denied in this regard.

### C.     The ALJ's Functional Equivalence Determination

Plaintiff also argues the ALJ's functional equivalence determination "was the product of legal error and was not supported by substantial evidence." [Doc. 23 at Page ID # 487]. Because the ALJ found Claimant had a marked limitation in the domain of interacting and relating with others (Tr. 23), a finding of a marked limitation in any of the other remaining five domains would result in a favorable determination for Claimant. Plaintiff argues the ALJ "reversibly erred because Claimant exhibited marked impairments in the first domain of acquiring and using information and the second domain of attending and completing tasks." [Doc. 23 at Page ID # 490]. Regarding these two domains, the ALJ wrote:

> The claimant has less than marked limitation in acquiring and using information.  In an agency questionnaire completed January 2013,

the claimant's motion indicated her son had difficulty delivering simple messages such as telephone messages and he was unable to recite his numbers or define common words; however, she noted the claimant used complete sentences most of the time, took part in conversations with other children and told about things and activities that happened in the past (Ex. 3E). As noted above, the claimant received speech and language therapy which appeared to immediately make a difference in his language. The psychological consultant indicated the claimant recalled and understood instructions in January 2013, and that he worked at an appropriate pace and persisted on tasks without encouragement (Ex. 1F). The claimant was also involved in an IEP for reading inclusion, math inclusion and reading lab and teachers indicated much improvement (Ex. 9F).

(Tr. 20).

The claimant has less than marked limitation in attending and completing tasks. The claimant's mother reported her son had difficulty paying attention in January 2013, for even 15 minutes to the television, music, reading aloud and playing games (Ex. 3E). Teachers noted the claimant was easily distracted but improved with use of a token reward system (Ex. 9F). Records from Centerstone show the claimant has had difficulty being easily distracted and had to be redirected at times to focus on the task at hand. However, sources noted the claimant earned computer time for listening, participating and being able to use self-control (Ex. 8F). In fact, the claimant's mother stated her son had been able to focus and concentrate without difficulty in April and May of 2015 (Ex. 8F). Therefore, although the claimant may experience some difficulty focusing, the record shows much improvement with medication and award system.

(Tr. 21-22).

Plaintiff first argues the ALJ erred by not explicitly including a discussion of the weight he assigned to the opinion evidence. However, as discussed above, it is clear the ALJ considered and partially credited the opinion of Dr. Cheah, the consultative examiner. And, in any event, neither Dr. Cheah's opinion nor the opinion of the state consultative examiners supports a finding of any greater limitation than BIF. With regard to attending and completing tasks, Dr. Cheah found that

14

while Claimant showed evidence of a moderate impairment in his ability to sustain concentration, his "attention and concentration appeared appropriate throughout the evaluation," and he "worked at an appropriate pace and persisted on tasks without encouragement." (Tr. 186).

Plaintiff emphasizes that Dr. Cheah diagnosed an IQ score of 70 for Claimant. She points out that the regulations provide that a "marked limitation" in children under eighteen is "the equivalent of functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2). The regulations further provide that "we will find that you have a 'marked' limitation when you have a valid score that is two standard deviations or more below the mean . . . on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score." *Id.* Finally, the regulations provide that the SSA may find a claimant has a marked limitation even where his test scores are slightly higher than two standard deviations below the mean if "other evidence shows that your impairment(s) causes you to function in school, home, and the community far below your expected level of functioning based on this score"; but on the other hand, where a claimant does have sufficiently low test scores, but "other information in your case record shows that your functioning in day-to-day activities is not seriously or very seriously limited by your impairment(s)." *Id.* § 926a(e)(4). The clear import of the regulations is that it is the claimant's ability to function that is more significant than the actual IQ score.

Plaintiff argues "[b]ecause the IQ testing alone was indicative of a marked impairment, the ALJ's failure to weigh the opinion of Dr. Cheah constitutes harmful reversible error." [Doc. 23 at Page ID # 491]. Plaintiff contends that the IQ score of 70 is more than two standard deviations

below the mean, and therefore the ALJ erred in not finding Claimant had a marked limitation in acquiring and using information.

Even assuming Plaintiff is correct that an IQ of 70 is more than two standard deviations below the mean, and assuming that a full scale IQ is designed to measure ability or functioning in acquiring and using information, the Court finds no error with the ALJ's finding that Claimant has a less than marked limitation in this domain.

As noted, the same doctor who diagnosed Claimant with a 70 IQ found that he functioned in the borderline range, and that he was able to follow simple spoken instructions. His teachers noted that by September 2015 he was "reading very well," was able to "express his wants," and can even have his "communication needs" met in a regular classroom, versus a special education classroom (Tr. 369). His educators also wrote that he was "able to retell stories using sequencing vocabulary, compare and contrast stories and events, and can carry an appropriate conversation about a topic with mastery." (Tr. 373). These are all relevant considerations in determining a claimant's limitations in acquiring and using information, and provide substantial support for the ALJ's finding that Claimant has a less than marked limitation in this domain. *See* 20 C.F.R. § 416.926a(g) (*e.g.*, For school age children, "[y]ou should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others."). The ALJ clearly relied on these reports, and did not issue his own medical findings, as Plaintiff contends.

As for the domain of attending and completing tasks, Plaintiff argues the ALJ erred in not finding a marked limitation because the ALJ relied on the fact that Claimant's condition improved

with medication [Doc. 23 at Page ID # 492-93]. Plaintiff argues, that the "medical evidence from Centerstone, which included the observations of therapists during classroom activities, far from establishes such definitive improvement." [*Id.* at 492].

The Court rejects Plaintiff's arguments. The same September 2015 IEP discussed above notes that Claimant was "much more motivated to work hard at school." (Tr. 369). As the ALJ points out, Claimant's improvement while taking his medication as prescribed is evidenced by statements from his medical providers as well as from Plaintiff, and is further evidenced by the fact that the prescriber, Dr. John Kirk, did not change the dosage over a period of several months, despite seeing Plaintiff once per month for medication management (*see* Tr. 273, 277, 287, 294, 305).

Finally, Plaintiff makes a passing argument that Claimant is entitled to a closed period of benefits because, Plaintiff argues, Claimant's improvement with medication did not begin until November 2014 [Doc. 23 at Page ID # 493]. The Court rejects this argument, first, because it is not properly addressed, and arguments not raised and supported in more than a perfunctory manner may be considered waived. *Woods v. Comm'r of Soc. Sec.*, No. 1:08-CV-651, 2009 WL 3153153, at *7 (W.D. Mich. Sept. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)).[5] Moreover, even in January 2013, Claimant had only moderate symptoms relating to this

---

[5] The one case Plaintiff cites in support of her argument for a closed period of benefits is readily distinguishable, as it involves a claimant who was a severe alcoholic and shot himself twice (nearly dying) before being hospitalized and going to rehab. *Mohr v. Bowen*, 845 F. 2d 326 (6th Cir. 1988). The court remanded for consideration of a closed period of benefits for the time during which the claimant was hospitalized following the attempted suicide, through the dates of two subsequent hospitalizations. The court concluded that there was substantial evidence to support the Commissioner's finding that the claimant could perform his past relevant work as of the date of the administrative hearing, which was approximately seven months after the last known date of hospitalization. *Id.* at *1-2.

domain, including sustaining concentration (Tr. 187). And, the IEP records show improvement in September 2013 with the "use of a token reward system." (Tr. 373).

For these reasons, the Court finds the ALJ's functional equivalence findings are supported by substantial evidence and are not the product of legal error. Plaintiff's motion will be denied in this regard.

### D. The ALJ's Credibility Determination/Use of video teleconferencing (VTC)

Concerning credibility issues, the ALJ found:

> After considering the evidence of record, I find the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained below.

> In terms of the claimant's alleged ADHD, the record shows the claimant has experienced some difficulty with attention and focus due to his condition; however, treating sources, teachers and the claimant's mother have all admitted the claimant's abilities improve when he is on prescribed medication. I also note Dr. Kirk, who has prescribed the claimant's medication, has not altered his medication regime (Ex. 8F). Therefore, it is obvious the claimant's functioning is improved with compliance of prescribed medication.

(Tr. 19).

"An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r*, 127 F.3d 525, 531 (6th Cir. 1997). Despite the deference that is due, such a determination must nevertheless be supported by substantial evidence. *Id.* An ALJ's credibility determination must contain "specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the

reasons for that weight." SSR 96-7p.[6]

Plaintiff argues the ALJ improperly faulted Claimant for not following his prescribed treatment regime. Plaintiff misreads the ALJ's decision. The ALJ did not discount Claimant's credibility because Claimant, a child, has failed to take his medication as prescribed. Rather, the ALJ finds that Claimant's symptoms are not as severe as Plaintiff alleges because Claimant's symptoms can be, and have been, improved through the use of medication. As the ALJ points out, Claimant's improvement while taking his medication as prescribed is evidenced by statements from his medical providers as well as from Plaintiff, and is further evidenced by the fact that the prescriber, Dr. John Kirk, did not change the dosage over a period of several months, despite seeing Plaintiff once per month for medication management (*see* Tr. 273, 277, 287, 294, 305). Moreover, the "type, dosage, effectiveness, and side effects of any medication taken to alleviate . . . symptoms" is an appropriate factor for an ALJ to consider when determining the credibility of a claimant's statements, or in this case, primarily the statements of the Claimant's mother. *See* 20 C.F.R. § 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 2039-40 (6th Cir. 1994) (applying credibility factors).

As part of her credibility argument, Plaintiff argues that the case should be remanded because the administrative hearing was conducted by video teleconferencing (sometimes, "VTC").

---

[6] The SSA published SSR 16-3p, *Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims*, which supersedes and rescinds SSR 96-7p, *Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*. SSR 16-3p eliminates the use of the term "credibility" from SSA policy because SSA regulations do not use this term, and subjective symptom evaluation is not an examination of a claimant's character. *See* SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016). SSR 16-3p took effect in March 2016, several months after the ALJ issued the decision, and it therefore does not apply in this case, nor does Plaintiff argue that it should.

SSA regulations provide that:

> (d) Objecting to appearing by video conferencing. Prior to scheduling your hearing, we will notify you that we may schedule you to appear by video teleconferencing. If you object to appearing by video teleconferencing, you must notify us in writing within 30 days after the date you receive the notice. If you notify us within that time period and your residence does not change while your request for hearing is pending, we will set your hearing for a time and place at which you may make your appearance before the administrative law judge in person.
>
> > (1) Notwithstanding any objections you have to appearing by video teleconferencing, if you change your residence while your request for hearing is pending, we may determine how you will appear, including by video teleconferencing . . . . For us to consider your change of residence when we schedule your hearing, you must submit evidence verifying your new residence.

20 C.F.R. § 416.1436(d).

As Plaintiff explains in her brief, after Claimant's application was denied, initially and on reconsideration, Plaintiff requested a hearing before an ALJ. The SSA acknowledged receipt of Plaintiff's request on October 24, 2013. It does not appear that the SSA ever notified Plaintiff that it would schedule her and Claimant to appear via VTC. Plaintiff, however, "preemptively objected" to appearance by VTC on October 6, 2014 (Tr. 114). Plaintiff's objection asks the SSA to "please schedule my hearing so that I may appear in person." (Tr. 114). The next pertinent document in the record is a "Notice of Hearing-Important Reminder," sent by the SSA to Plaintiff on July 20, 2015 (Tr. 120). It states that the SSA had recently mailed a hearing notice to Plaintiff, which requested that Plaintiff sign and return an acknowledgement form. Plaintiff does not contend that she never received the original hearing notice, but she does point out that the original hearing notice is not in the record before the Court [Doc. 23 at Page ID # 476]. The July 20, 2015,

follow up "Important Reminder" notice makes no mention of the use of VTC in Plaintiff's case.

Plaintiff did change residences, at least once, while awaiting her hearing notice. As the regulation quoted above provides, the SSA may require claimants to appear by VTC if they move during the pendency of their claim. As far as the Court can glean from the record before it, however, the SSA never formally overruled Plaintiff's objection to the use of VTC, or even informed Plaintiff that it would require her to appear by VTC. This is troubling, but the Court nevertheless will reject Plaintiff's argument because Plaintiff did not object to the use of VTC in response to the "Notice of Hearing-Important Reminder" document or at the actual hearing, which indicates that she and her attorney at the time acquiesced in the use of VTC. While the Court would not require a claimant to refuse to participate in a hearing in order to preserve an objection to the use of VTC, some mention by Plaintiff or her counsel should have been raised at the hearing in order for current counsel to credibly complain about it now.

Moreover, the two cases Plaintiff cites in support of her argument that the use of VTC in her case is harmful error involve testimony offered by a vocational expert via *telephone*, not video conferencing, and are therefore readily distinguishable, because SSA regulations do not specifically allow for testimony via telephone the way they do for video conferencing. *See Koutrakos v. Astrue*, 906 F. Supp. 2d 30 (D. Conn. 2012); *Decker v. Comm'r of Soc. Sec.*, No. 2:12-CV-0454, 2016 WL 193664 (S.D. Ohio Jan. 15, 2016).

## V.    CONCLUSION

For the above reasons, it is **ORDERED** that:

1) Plaintiff's motion for summary judgment  [Doc. 22] is **DENIED**;

2) The Commissioner's motion for summary judgment [Doc. 24] is **GRANTED**; and

3) The Commissioner's decision denying benefits is **AFFIRMED**.

SO ORDERED.

ENTER:

_s/ Susan K. Lee_

SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE